PILLSBURY WINTHROP SHAW PITTMAN LLP
MARCIA L. POPE #124878
ALEX PONCE DE LEON #247427
50 Fremont Street
Post Office Box 7880
San Francisco, CA 94120-7880
Telephone: (415) 983-1000
Facsimile: (415) 983-1200

Attorneys for Defendant
CHEVRON U.S.A. INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD A. DUSTE,<br><br>Plaintiff,<br><br>vs.<br><br>CHEVRON PRODUCTS COMPANY, INC., a corporation, DOES ONE through TWENTY,<br><br>Defendants. | No. CV 08 3980 MEJ<br><br><u>DEFENDANT CHEVRON U.S.A. INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES</u><br>[Fed. R. Civ. Proc. 56]<br><br>Date: November 5, 2009<br>Time: 10:00 a.m.<br>Dept.: Courtroom B<br><br>JUDGE MARIA ELENA JAMES |

NOTICE OF MOTION, MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT CHEVRON U.S.A. INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

TABLE OF CONTENTS

NOTICE OF MOTION ....... 1

MEMORANDUM OF POINTS AND AUTHORITIES ....... 1

I. INTRODUCTION AND SUMMARY OF THE ARGUMENT ....... 1

II. STATEMENT OF FACTS ....... 3

A. Plaintiff's job duties as a manager within Chevron's Global Aviation Division ....... 3

B. The routine audits of expense reporting within the Global Aviation Division, and the resulting identification of concerns among Plaintiff's direct reports ....... 4

C. Taylor's interview with Plaintiff ....... 6

D. The results of Taylor's investigation, and Hinzie's decision to terminate Plaintiff's employment ....... 7

E. Doug Hinzie's meeting with Plaintiff on October 12, 2007 ....... 8

F. Chevron's assiduous maintenance of confidentiality about the circumstances of Plaintiff's departure, and Plaintiff's success in obtaining other employment ....... 9

G. The absence of any contract or agreement regarding employment between Plaintiff and Chevron ....... 9

H. Plaintiff's lack of damages. ....... 10

ARGUMENT ....... 10

III. PLAINTIFF'S FIRST THROUGH FIFTH CAUSES OF ACTION ARE ALL PREEMPTED BY THE CALIFORNIA WORKERS' COMPENSATION ACT ....... 10

IV. PLAINTIFF'S TORT CLAIMS ARE ALSO SUBJECT TO DISMISSAL FOR INDEPENDENT REASONS. ....... 12

A. The first cause of action for negligence is barred because Plaintiff cannot establish a prima facie case ....... 12

B. The second and third causes of action for intentional and negligent interference with contractual relations are barred because there can be no "interference" on these facts ....... 13

C. The fourth and fifth causes of action for negligent and intentional infliction of emotional distress are also barred because Plaintiff cannot demonstrate the elements of a prima facie case ....... 14

1. There is no "outrageous" conduct. ....... 14

2. There is no evidence of "severe emotional distress." ....................... 15

D. The sixth and seventh causes of action for slander and libel are barred because no false, malicious or unprivileged statements were made by any managing agent of Chevron .................................................. 15

1. The internal communications related to Taylor's investigation and Hinzie's termination decision .................................................. 16

2. The communications by Keith Sawyer to Chevron dealers and distributors with whom Plaintiff had been a key Chevron contact........................................................................................ 18

3. The alleged statements made by Tim Black to Ed Zwirn ................ 18

4. As an independent basis for dismissal, Plaintiff has shown no damage flowing from Black's alleged slander. ................................ 19

V. PLAINTIFF'S BREACH OF CONTRACT CLAIM (EIGHTH CAUSE OF ACTION) SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS IDENTIFIED NO CONTRACT BETWEEN HIMSELF AND CHEVRON .......... 20

VI. PLAINTIFF'S CLAIM FOR VIOLATION OF THE UCL (NINTH CAUSE OF ACTION) FAILS AS A MATTER OF LAW.................................................... 20

VII. CONCLUSION ......................................................................................... 22

TABLE OF AUTHORITIES

Cases

*Apple v. Lee Swett Livestock Co.*,
192 Cal. App. 3d 466 (1987) .................................................................... 11

*Cohen v. NuVasive, Inc.*,
164 Cal. App. 4th 868 (2008) .................................................................... 12

*Cole v. Fair Oaks Fire Protection Dist.*,
43 Cal. 3d 148 (1987) .................................................................... 11, 12, 14

*Deaile v. General Telephone Co. of California*,
40 Cal. App. 3d 841 (1974) .................................................................... 17

*Dorn v. Mendelzon*,
196 Cal. App. 3d 933 (1987) .................................................................... 17

*Dryden v. Tri-Valley Growers*,
65 Cal. App. 3d 990 (1977) .................................................................... 13

*Ducey v. argo Sales Co.*,
25 Cal. 3d 707 (1979) .................................................................... 19

*Herr v. Nestle U.S.A., Inc.*,
109 Cal. App. 4th 779 (2003) .................................................................... 20

*Institute of Athletic Motivation v. University of Illinois*,
114 Cal. App. 3d 1 (1980) .................................................................... 17

*Janken v. GM Hughes Electronics*,
46 Cal. App. 4th 55 (1996) .................................................................... 15

*Johnson v. Hertz Local Edition Corp.*,
No. C 03-4439 MJJ, 2004 WL 2496164 (N.D. Cal. Nov. 3, 2004) .................. 20, 21

*Kacludis v. GTE Sprint Communications Corp.*,
806 F. Supp. 866 (N.D. Cal. 1992) .................................................................... 13

*Kasky v. Nike*,
27 Cal.4th 939 (2002) .................................................................... 20, 21

*Kelly v. General Telephone Co.*,
136 Cal. App. 3d 278 (1982) .................................................................... 13

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal. 4th 1134 (2003) .................................................................... 20, 21

*Livitsanos v. Superior Court*,
2 Cal. 4th 744 (1992) .................................................................... 11

*McCabe v. General Foods Corp.*,
811 F.2d 1336 (9th Cir. 1987) .................................................................... 13

*Monterey Plaza Hotel v. Hotel Employees Local 483*,
69 Cal. App. 4th 1057 (1999) ........................................................................ 16

*Munyon v. Ole's, Inc.*,
136 Cal. App. 3d 697 (1982) ........................................................................ 19

*Newberry v. Pacific Racing Ass'n*,
854 F.2d 1142 (1988) ........................................................................ 17

*Ortaliza v. General West*,
1995 U.S. App. LEXIS 12791, *4 (9th Cir. 1995) ........................................ 14

*Pichon v. Pacific Gas & Electric Co.*,
212 Cal. App. 3d 488 (1989) ........................................................................ 11

*Pitman v. City of Oakland*,
197 Cal. App. 3d 1037 (1988) ........................................................................ 14, 15

*Schneider v. TRW, Inc.*,
938 F.2d 986 (9th Cir. 1991) ........................................................................ 14

*Spratley v. Winchell Donut House*,
188 Cal. App. 3d 1408 (1987) ........................................................................ 11

*Trerice v. Blue Cross of California*,
209 Cal. App. 3d 878 (1989) ........................................................................ 14

*Yamaguchi v. Harnsmut*,
106 Cal. App. 4th 472 (2003) ........................................................................ 19

*Yurick v. Superior Court*,
209 Cal. App. 3d 1116 (1989) ........................................................................ 14

*Zoeller v. Sterling Capital Mortgage*,
No. C-99-1045 PJH, 2000 WL 1175587 (N.D. Cal. Aug. 14, 2000) ...................... 21

Statutes and Codes

California Business & Professions Code
Sections 17200........................................................................ 2, 20

California Civil Code
section 46........................................................................ 18

California Labor Code
section 3602........................................................................ 10

Federal Rules of Civil Procedure
Rule 56........................................................................ 1

Other Authorities

*California Forms of Pleading and Practice*,
vol. 21, section 248.16[1] ........................................................................ 19

Restatement (Second) of Torts
Section 46 cmt. j .......................................................................................... 14

NOTICE OF MOTION

TO PLAINTIFF RICHARD A. DUSTE AND TO HIS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on Thursday, November 5, 2009, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom B of this Court, located on the 15th Floor of the Federal Building at 450 Golden Gate Avenue, San Francisco, California, Defendant CHEVRON U.S.A. INC. (erroneously named herein as "Chevron Products Company, Inc.") ("Chevron") will move and hereby moves this Court, pursuant to Fed. R. Civ. P. 56, for an order granting summary judgment or, in the alternative, partial summary judgment in this matter. Defendant's motion is made on the grounds that there is no triable issue of material fact with respect to any of Plaintiff's claims. The motion will be based on this Notice, the attached Memorandum of Points and Authorities, the Joint Statement of Undisputed Facts, the Declarations of Marcia Pope, Debra Taylor and Doug Hinzie served and filed herewith, the papers, records, and files herein, and on the argument of counsel to be presented at the time of the hearing.

MEMORANDUM OF POINTS AND AUTHORITIES

I. INTRODUCTION AND SUMMARY OF THE ARGUMENT.

Plaintiff Richard Duste was a high level manager employed by Chevron from January 16, 1998 until his termination on October 12, 2007. Plaintiff's employment was terminated after an extensive investigation revealed that he had abdicated his managerial duties by approving over $28,000 in fraudulent expense reports submitted by a direct subordinate. In so doing, Plaintiff had ignored repeated e-mail messages to the employee, on which he was copied, itemizing a variety of delinquent and questionable expense charges, which should have been a red flag to any conscientious manager.

After careful consideration of the investigative information provided to him by Chevron's internal security organization, Doug Hinzie, president of Chevron's Global Aviation Division, made the decision to terminate Plaintiff's employment. He concluded that Plaintiff's role in approving these expenses was at best gross negligence, and at worst intentional misconduct.

Either way, Hinzie made the legitimate and justifiable business judgment that such an abdication by Plaintiff of his managerial duties was inexcusable.

Less than two months after his termination, Plaintiff obtained comparable employment with another oil company, British Petroleum. He has been steadily employed since that time. Chevron has never disclosed the basis for Plaintiff's termination -- or even the fact that he had been terminated, as opposed to leaving of his own volition -- to anyone outside of Chevron.

In this lawsuit, Plaintiff asserts nine[1] causes of action:

(1) Negligence;

(2) Intentional interference with contractual relations;

(3) Negligent interference with contractual relations;

(4) Intentional infliction of emotional distress;

(5) Negligent infliction of emotional distress;

(6) Slander;

(7) Libel (misnumbered in the complaint as "6" again);

(8) Breach of contract; and

(9) Unfair business practices under California Business & Professions Code section 17200.

As we demonstrate in more detail below, there is no evidentiary support for any of Plaintiff's claims. The undisputed material facts support summary judgment for Chevron as a matter of law.

[1] Plaintiff's complaint names Chevron in only the last two causes of action. The first three claims are pled only against "Doe" defendants, none of whom have ever been named. Claims 4-7 reference Chevron, but only on the basis of *respondeat superior* liability. In the interest of completeness, we address all nine claims in this motion, without intending to concede that Chevron has been properly named as to any claims other than one and two.

## II. STATEMENT OF FACTS.

### A. Plaintiff's job duties as a manager within Chevron's Global Aviation Division.

Plaintiff's employment with Chevron began on January 16, 1998. Deposition of Richard A. Duste ("Duste Dep.") 12:6-16, Exh. 1 (attached as an Exhibit to the Declaration of Marcia Pope ("Pope Decl."), served and filed herewith). In October of 2001, Plaintiff was promoted to the position of sales manager, which he held until August 1, 2006. *Id*., 84:21-85:11. The sales manager position was a level 25 (*id*., 85:14-86:6), which is considered a high level manager within the Company. Declaration of Doug Hinzie ("Hinzie Decl.") served and filed herewith, ¶ 9. Plaintiff was responsible for directly managing a sales force of six territory managers for the Global Aviation Division's customers in the 50 states, the Caribbean and Latin America. *Id*., 86:7-89:3. As part of that responsibility, Plaintiff was an expense report approver for his subordinates. *Id*., 102:1-4, 116:10-13.

As a Chevron employee, Plaintiff understood that he was expected to follow the Company's policies and procedures. Duste Dep. 82:15-24. He was aware that Chevron had a travel and expense accounting policy ("TEA" Policy 585), which he had seen sometime prior to mid-2006. *Id*., 97:14-99:23. There were references to the policy in a variety of places, and the policy was "talked about," so employees were "aware it's out there." *Id*. 103:18-104:15.

Consistent with that policy, Plaintiff testified that the following summary accurately reflected his responsibilities as an expense report approver:

> To ensure that employees understand the Corporate Travel policy, the business purpose for the trip, and the need to exercise good judgment while traveling;
>
> To review expense reports for appropriateness and correctness;
>
> To review and promptly approve for reimbursement all reasonable and necessary expenses incurred by employees conducting business on behalf of the Company; and
>
> To ensure that employees submit expense reports in a timely manner consistent with expense reporting guidelines.
>
> Duste Dep. 100:16-18, 102:5-103:15, Exh. 6.

Plaintiff was also familiar with a variety of examples of misuse of the company travel policy, including submission of false expenses, and inappropriate entertainment of clients. Duste Dep. 107:25-109:3, Exh. 8. Plaintiff understood that as a supervisor at Chevron, he was responsible for satisfying himself that his subordinates' expense reports were accurate. *Id*., 105:18-106:2. Specifically, Plaintiff was responsible for reviewing his direct reports' expense reports, making inquiries when follow-up was required, and, where appropriate, approving the expense reports submitted. *Id*., 116:10-121:12. Plaintiff understood that "[v]iolation of policy may subject the employee to disciplinary action that may include non-reimbursement of expenses, cancellation of credit card privileges, and disciplinary action up to and including termination." *Id*., 105:5-17.

B. The routine audits of expense reporting within the Global Aviation Division, and the resulting identification of concerns among Plaintiff's direct reports.

As part of Chevron's finance and auditing function, the Company implements periodic spot checks in which various employee expense reports are randomly selected for review and auditing. Hinzie Decl., ¶ 2. These spot checks are conducted under the purview of Astley Blair, the Division Finance Officer for the Global Supply and Trading organization. *Id*.; Deposition of Astley Blair ("Blair Dep.") (attached as an exhibit to the Pope Decl.), 4:1-5, 9:20-10:15. In early 2007, a routine spot check resulted in the random identification of expense reports submitted by an employee by the name of Chris Browning.[2] Hinzie Decl., ¶ 4. The expense reports pulled were from a period of time in 2005 when Browning reported directly to Plaintiff, and Plaintiff was responsible for both reviewing and approving the reports. Declaration of Debra Taylor ("Taylor Decl.") served and filed herewith, ¶¶ 2, 3. The expense reports showed irregularities, and as a result, Blair initiated an investigation with the Company's Corporate Security department. Blair Dep. 21:19-25:10; Taylor Decl., ¶ 2.

---

[2] Although Chevron would normally not disclose third party employee names in court documents, Mr. Browning has been the subject of a criminal prosecution and conviction related to his fraudulent expense reports, and his admitted misconduct is thus already a matter of public record. Taylor Decl., ¶ 7.

Corporate Security Advisor Debra Taylor was tasked with investigating Browning's expense reporting. Taylor Decl., ¶ 2. Taylor pulled Browning's expense reports for 2005 and into 2006, and also pulled related documentation. Taylor Decl., ¶ 3. This related documentation included email messages that were automatically generated from the Company's travel and expense reporting system to employees, with copies to their managers, when the employees' corporate credit card expenses had not been timely submitted for reimbursement.[3] *Id.*

In the course of her investigation into Browning's expense reports, Taylor interviewed Browning and several other employees[4] about these and related concerns. Taylor Decl., ¶ 6. She ultimately concluded that Browning had engaged in a pattern of systematic, sustained fraudulent expense reporting. *Id.* The fraudulent conduct included, for example, submitting claims for reimbursement for airline tickets where flights were not actually taken, and for which Browning had received reimbursement from the airline as well; submitting claims for excessive entertainment expenses; and submitting claims for entertainment expenses at questionable establishments, such as strip clubs. *Id.* In all, Browning submitted over $28,000 in fraudulent expenses that were approved by Plaintiff. *Id.*; Duste Dep. 168:2-169:7. Browning's employment with Chevron was terminated as a result. Taylor Decl., ¶ 6.

While investigating Browning, Taylor found at least ten TEA email notifications itemizing delinquent and irregular expense report items that Browning had incurred on his corporate credit card from mid-2005 to early 2006. Taylor Decl., ¶ 8. Plaintiff was copied on these email messages, in his capacity as Browning's manager. *Id.*; Duste Dep. 194:3-13, Exh. 11. Each such notice stated: "Please note that your manager is being copied on this email due to the

---

[3] Chevron's business expense reimbursement system was an automated system in which expenses charged to an employee's corporate credit card were first recorded by the bank providing the credit card. Duste Dep. 116:14-125:12; Blair Dep. 15:23-16:22, 40:15-41:14; Taylor Decl., ¶ 4. The expenses then automatically "populate" a computerized expense report that is sent to the employee for review and approval. *Id.* Employees go through the expense report for accuracy, and then submit it to their direct supervisors for approval. *Id.* When an employee does not respond to the electronic itemization sent to him by the system, or does not approve and submit the expenses, both the employee and his manager receive periodic emails reminding them of the outstanding charges and requesting resolution. *Id.*

[4] One such interviewee was employee Tim Black, another of Plaintiff's subordinates.

extended number of days." *Id*. As Plaintiff explained in his deposition, Chevron's Travel and Expense reporting system would automatically send email messages to employees who had not properly and timely submitted expenses that had been incurred on their corporate credit cards. Duste Dep. 194:14-195:22; *see also*, Taylor Decl., ¶ 8. If employees ignored these messages, their supervisors would be copied as well. *Id*.

Although Plaintiff admitted to receiving such email messages about his own subordinates, he did not make it a practice to follow up with them. Duste Dep. 195:23-196:6. In particular, he had no conversations with Browning about the delinquent charges referenced on the emails he received. *Id*., 196:15-19. And, although Plaintiff testified that he would have considered any charge over $500 for entertainment and meals as something that he would "want to look at [], see what's up" (*id*., 198:18-199:7), he nevertheless ignored at least 23 such entries in the TEA email messages on which he was copied. *Id*., Exh. 11.[5]

C. Taylor's interview with Plaintiff.

Given the magnitude of Browning's fraudulent submissions, Taylor arranged for an interview with Plaintiff in August 2007. Duste Dep. 149:12-19, 152:20-153:1; Taylor Decl., ¶ 9. The interview lasted approximately three hours (*id*., 155:25-157:2), during which time Taylor reviewed spreadsheets of Browning's charges with Plaintiff, and asked him about the conduct for which Browning had been terminated. *Id*., 160:5-164:10. During their meeting, which Plaintiff acknowledges was conducted in a professional and respectful manner (Duste Dep. 171:9-24), Plaintiff was given the opportunity to respond to questions and to explain his side of the story. *Id*., 160:1-164:10. In particular, he explained his view that he was not responsible for having picked up on Browning's fraudulent charges. *Id*. At the conclusion of the interview, there was nothing that Plaintiff had wanted to say, but was prevented from doing so. *Id*., 171:25-172:3.

[5] Eventually, in May or June of 2006, Plaintiff did notice one such charge by Browning, and followed up with him. Duste Dep. 126:21-129:9. At that time, he discovered that the entry "D Houston's" was a "gentlemen's club." *Id*. Significantly, despite his protestations in this case that taking clients to strip clubs was not a violation of Chevron policy, he instructed Browning, "spending this much money in a gentlemen's club and, you know, let's just don't do this anymore." *Id*., 128:11-25. Such diligence on Plaintiff's part at an earlier date would have saved the Company tens of thousands of dollars.

In his deposition, Duste identified five instances where he had attended "gentlemen's clubs" for business entertainment purposes. Duste Dep. 131:15-132:11 . On two such occasions, he purchased "lap dances" for himself. *Id*., 133:12-135:4. Nevertheless, at least initially during his interview with Taylor, Plaintiff, denied having attended strip clubs himself on company business, claiming that he "misunderstood" the question. Duste Dep. 183:80-185:11; Taylor Decl., ¶ 10.[6]

D. <u>The results of Taylor's investigation, and Hinzie's decision to terminate Plaintiff's employment</u>.

At the conclusion of Taylor's investigation, six employees in all were found to have engaged in some degree of misconduct related to their expense reporting, ranging from outright fraud in the case of Browning, to poor judgment in business entertainment in the case of others. Taylor Decl., ¶ 11. Of the six employees, three[7] reported to Plaintiff and submitted their expense reports to him for approval during the time period in question. *Id*. Taylor kept Hinzie periodically updated on her investigative results, and ultimately submitted to him written summaries of the facts she had uncovered. *Id*., ¶ 12, Exh. C; Hinzie Decl., ¶¶ 8, 9, Exh. A. Other than quibbling about whether he agrees with Taylor referring to "strip club" charges as "inappropriate," and whether the report inaccurately suggests that he "took customers to a 'brothel,'" Plaintiff admits that he had "approved a large number of inappropriate charges, including strip club entertainment with clients, airfare charges where trips were not taken, and high dollar cash expenses from June 2005 to February 2006." Duste Dep., 178:2-181:15, 261:10-263:1, Exh. 12.

Taylor's investigation and her report were kept strictly confidential, and disseminated only on a need-to-know basis within the Company. Taylor Decl., ¶ 13. Witnesses interviewed

---

[6] At the end of the day, however, Plaintiff's admitted attendance at strip clubs with clients was not the basis for the termination of his employment. Hinzie Decl., ¶ 12. His employment was terminated because, despite being a high level manager at Chevron, responsible for ensuring his subordinates' adherence to important company policies, he took no steps to investigate or ensure compliance with those policies by direct report Chris Browning and others.

[7] Again, one of these was Tim Black.

were explicitly instructed that the investigation was confidential, and that they were not to discuss it or disclose anything they reported or heard to others. *Id*., ¶ 14. A copy of Taylor's report was provided to Hinzie, Blair, and Human Resources liaison Jennifer Edris, who provided advice and counsel to Hinzie. *Id*., ¶ 13. The report was also provided to the Company's internal legal department and other limited senior personnel for the same purpose. Hinzie Decl., ¶ 9. No one else within the Company was apprised of the details of the investigation into Plaintiff's conduct, or the decision to terminate his employment. *Id*.; Taylor Decl., ¶ 13.

After carefully considering the facts and circumstances, two employees – Browning and Plaintiff – were determined to have engaged in inexcusable misconduct or negligence, and as a result, their employment with Chevron was terminated. Hinzie Decl., ¶ 9.[8]

E. Doug Hinzie's meeting with Plaintiff on October 12, 2007.

On October 12, 2007, Hinzie flew to California to meet in person with Plaintiff. Hinzie Decl., ¶ 10; Duste Dep. 201:20-202:12. The two of them, along with Human Resources Manager Randy Mazur, met for about 45 minutes, and discussed Taylor's investigative findings. *Id*.; 202:19-203:14; Hinzie Decl., ¶ 10. During that meeting, Plaintiff repeated the same information and explanations that he had provided to Taylor during his interview with her. Duste Dep. 203:15-206:6; Hinzie Decl., ¶ 10. He offered no new details or excuses for his abdication of managerial responsibility. *Id*. As a result, Hinzie proceeded with notifying Plaintiff that his employment with the Company would be terminated, effective that day. Duste Dep. 207:14-209:1, Exh. 12; Hinzie Decl., ¶ 10, Exh. B.

Plaintiff believes that Hinzie treated him in a "negligent" manner because he asserts that Hinzie did not have the "whole story" when he made the termination decision. Duste Dep., 273:6-275:3.[9] He admits that he does not know, however, all of the steps that Hinzie took in reaching the decision to terminate his employment. *Id*., 276:15-18.

---

[8] Two of the remaining four employees were suspended, and two others received formal written reprimands. Hinzie Decl., ¶ 11.

[9] No one else at the Company treated Plaintiff in a negligent manner, according to Plaintiff. Duste Dep. 273:6-275:3.

F. Chevron's assiduous maintenance of confidentiality about the circumstances of Plaintiff's departure, and Plaintiff's success in obtaining other employment.

During his deposition, Plaintiff testified to his belief that Chevron had disclosed to four company distributors/dealers that he was "no longer with the Company" (Duste Dep. 222:17-225:9, 227:9-231:3); but he admitted that there would have been a legitimate business reason for that information to have been disclosed. *Id.*, 224:17-225:9. He could not identify any of the four – including Ed Zwirn – whom he believes were told the specific details of his departure, and he cannot even say for sure who told them that he had left. *Id.* In fact, Plaintiff later testified that *he* had disclosed the fact he had been terminated by Chevron to these and many others. *Id.*, 293:4-294:16. Moreover, none of the four individuals identified by Plaintiff treated him any differently as a result of the information allegedly conveyed. *Id.*, 231:4-9.

At no time has any managing agent of Chevron been authorized to disclose to third parties that Plaintiff's employment with the Company was terminated, or any details related to the internal investigation. Hinzie Decl., ¶ 13. At most, where Plaintiff had been a primary contact with a company distributor or dealer, Chevron management advised them that he was no longer with the Company, as a matter of courtesy and business necessity. Id.[10]

G. The absence of any contract or agreement regarding employment between Plaintiff and Chevron.

During the course of his employment at Chevron, Plaintiff understood his employment to be terminable "at will." Duste Dep. 80:15-82:14, Exh 4. Further, he does not believe that his termination from employment by Chevron violated any company policies or procedures. *Id.*, 211:12-15. And, Plaintiff cannot identify anyone at Chevron who interfered with any sort of "contract" that he had, either with Chevron or anyone else. *Id.*, 272:23-273:4.

[10] Plaintiff has submitted facts in the parties' joint statement of facts to the effect that former Chevron employee Tim Black disclosed to a third party in late 2007 that Plaintiff had been terminated due to "frequenting" strip clubs and brothels. As we discuss in part III.D.3. below, these belated "facts," even if true, are irrelevant to Plaintiff's defamation claim against Chevron because Black was not acting as an "agent" of Chevron, and his conduct cannot be imputed to Chevron.

H. Plaintiff's lack of damages.

By Thanksgiving 2007 – only 1 ½ months after his termination from Chevron -- Plaintiff had obtained another job. Duste Dep. 47:2-10, 49:24-51:6. He started working for British Petroleum ("BP") in early December 2007. *Id*. Thereafter, in June 2008, he moved on voluntarily to his current employer, ConocoPhillips. *Id*., 60:13-65:12. He testified that he, himself, disclosed to BP that Chevron had terminated his employment based on his role in approving inappropriate expense reports for a direct subordinate. *Id*., 57:1-21. ConocoPhillips did not inquire into the reason for his termination, and he did not disclose it. *Id*., 69:11-17. Although Plaintiff testified to a sense of "stigma" that he feels in connection with his termination by Chevron, he can point to no prospective employment that he has been unable to obtain due to any alleged disclosure of the circumstances of his termination; and he can identify no other damages resulting from such alleged disclosures. *Id*., 69:18-72:16, 74:4-10. He is currently, and has been since the termination of his employment, physically and emotionally healthy. *Id*., 288:23-289:22. He has not sought the assistance of any medical professionals, psychologists, psychiatrists or counselors because he "[hasn't] felt the need to." *Id*.

In any event, Plaintiff does not know of anyone at Chevron who took action towards him because they wanted to hurt him, as opposed to having some other business reason for taking the action. Duste Dep. 231:10-15.

## ARGUMENT

## III. PLAINTIFF'S FIRST THROUGH FIFTH CAUSES OF ACTION ARE ALL PREEMPTED BY THE CALIFORNIA WORKERS' COMPENSATION ACT.

The California Workers' Compensation Act provides the "sole and exclusive remedy" for an employee's claim of injuries caused by conduct that normally occurs in the workplace. Cal. Labor Code § 3602. Each of Plaintiff's causes of action for negligence, intentional and negligent interference with contractual relations, and intentional and negligent infliction of emotional distress, are premised entirely on events alleged to have occurred during Plaintiff's employment – namely, the investigation into his conduct as a manager, and the discipline that was imposed as a result.

In a line of decisions beginning with *Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal. 3d 148 (1987), the California Supreme Court has made clear that tort claims such as these are not cognizable, but instead are preempted by the Workers' Compensation Act. In *Cole*, the Supreme Court concluded that claims by employees for injuries resulting from day to day conduct are barred by the exclusive remedy doctrine. *Id*., 43 Cal. 3d at 160. Later, in *Shoemaker v. Myers*, 52 Cal. 3d 1 (1990), the Court held that "[e]ven if such conduct may be characterized as intentional, unfair or outrageous, it is nevertheless covered by the workers' compensation exclusivity provisions." *Id*. at 25. Thereafter, in *Livitsanos v. Superior Court*, 2 Cal. 4th 744 (1992), the California Supreme Court held that claims for intentional or negligent conduct arising from the employment relationship are preempted by the Workers' Compensation Act even where no physical injury or disability is alleged..

While most often arising in the context of torts for intentional and negligent infliction of emotional distress, workers' compensation exclusivity applies to all tort causes of action based upon conduct which is part of the employment relationship. As stated by the California Supreme Court in *Cole*, "the action is barred by the exclusiveness clause no matter what its name or technical form if the usual conditions of coverage are satisfied." 43 Cal. 3d at 160. *Accord*, *Pichon v. Pacific Gas & Electric Co.*, 212 Cal. App. 3d 488, 496 (1989) (workers' compensation "the exclusive remedy for injuries to [an employee's] psyche, regardless of the title of the cause of action"). *Compare*, *Apple v. Lee Swett Livestock Co.*, 192 Cal. App. 3d 466, 469-475 (1987) (dismissing all causes of action for fraud); *Spratley v. Winchell Donut House*, 188 Cal. App. 3d 1408, 1412-13) (1987) (dismissing claim for fraudulent inducement to contract).

The facts in *Shoemaker* and *Cole* provide an instructive comparison. In *Shoemaker*, the plaintiff was threatened, intimidated, harassed, disciplined, and eventually terminated as the result of an investigation he conducted of possible illegal practices by his employer. *Id*. at 7-9. One manager said he knew the termination would not be upheld, but he "just wanted to cause [plaintiff] as much grief as possible." *Id*. at 25. In *Cole*, the plaintiff's manager subjected him to a deliberate campaign of harassment which included unjustified discipline, a temporary demotion, and an attempt to force plaintiff to retire, all of which caused plaintiff to suffer a

severe, totally disabling stroke. Despite the egregiousness of the behavior, the California Supreme Court in both cases ruled that the conduct alleged was a normal part of the employment relationship, and that the plaintiffs' emotional distress claims were therefore preempted by the Workers' Compensation Act. *Shoemaker*, 52 Cal. 3d at 25; *Cole*, 43 Cal. 3d at 161 ("Some harassment by superiors when there is a clash of personality or values is not uncommon. Disciplinary hearings and demotions and friction in negotiation as to grievances are also an inherent part of the employment setting . . . .").

The alleged behavior at issue in this case – an investigation resulting in a decision to terminate Plaintiff's employment – without any discourtesy or lack of professionalism on the part of Chevron or its employees, is decidedly less egregious than the conduct at issue in any of the foregoing cases, and falls squarely within the preemption doctrine.

## IV. PLAINTIFF'S TORT CLAIMS ARE ALSO SUBJECT TO DISMISSAL FOR INDEPENDENT REASONS.

### A. The first cause of action for negligence is barred because Plaintiff cannot establish a prima facie case.

The elements of a negligence cause of action are (1) the existence of a duty to exercise due care, (2) breach of that duty, (3) causation, and (4) damages. *Cohen v. NuVasive, Inc.*, 164 Cal. App. 4th 868 (2008). Plaintiff identified in his deposition only Hinzie as having treated him in a negligent manner, based on Plaintiff's belief that Hinzie did not have the "whole story' when he made the termination decision. But the evidence of Taylor's thorough investigation into the expense fraud issue, and Hinzie's thoughtful consideration of all of the facts before making the termination decision, is uncontradicted.

Likewise, as discussed at Part II.H. above, Plaintiff has apparently suffered no damages as a result of any alleged breach of duty on Chevron's part. His first cause of action should therefore be dismissed.

B.   The second and third causes of action for intentional and negligent interference with contractual relations are barred because there can be no "interference" on these facts.

Plaintiff's second and third causes of action assert that certain unidentified individuals, "acting in the course and scope of their employment with Chevron," interfered with an alleged contractual relationship between Plaintiff and Chevron.  These causes of action apparently are premised on a contention that Chevron investigator Debra Taylor made misleading statements about Plaintiff in reporting the results of her investigation.  Specifically, Plaintiff takes issue with a reference in Taylor's investigative report that Plaintiff had visited a "brothel" with company customers.

We note first that, as a factual matter, Plaintiff testified in his deposition that there was no "contract" between himself and Chevron, and that he was aware of no policy or procedure that had been violated in the decision to terminate his employment.  These admissions should be dispositive, since by Plaintiff's testimony, there was no "contract" with which to interfere.

Even if Plaintiff's admissions are disregarded, however, the facts do not support these claims as a matter of law.  A cause of action for tortious interference with contract will not lie against a party to the contract that has allegedly been interfered with.  *Dryden v. Tri-Valley Growers*, 65 Cal. App. 3d 990, 999 (1977).  *Compare, Kelly v. General Telephone Co.*, 136 Cal. App. 3d 278, 288 (1982) (dismissing a claim for intentional interference with prospective economic advantage where the basis for the claim was an allegation that the defendant company, through its management employees, had intentionally interfered with the plaintiff's attempts to be rehired); *accord, Kacludis v. GTE Sprint Communications Corp.*, 806 F. Supp. 866, 872-73 (N.D. Cal. 1992) (applying California law, and dismissing plaintiff's claim for interference with prospective economic advantage); *McCabe v. General Foods Corp.*, 811 F.2d 1336 (9th Cir. 1987) (applying California law, and dismissing claims for interference with contractual relations against individual managers on the basis of managerial privilege).

Consistent with this line of authority, Plaintiff's third and fourth causes of action should be dismissed.

C. The fourth and fifth causes of action for negligent and intentional infliction of emotional distress are also barred because Plaintiff cannot demonstrate the elements of a prima facie case.

To state a viable claim for infliction of emotional distress, Plaintiff must demonstrate (1) extreme and outrageous conduct by the defendant; (2) the plaintiff suffering extreme and severe emotional distress; and (3) actual and proximate causation by the defendant's outrageous conduct. *Ortaliza v. General West*, 1995 U.S. App. LEXIS 12791, *4 (9th Cir. 1995).

1. There is no "outrageous" conduct.

"Outrageous" conduct exceeds "all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Yurick v. Superior Court*, 209 Cal. App. 3d 1116, 1129 (1989) (citation omitted). The requirements of the tort are "rigorous, and difficult to satisfy." *Id.* As the California Supreme Court has observed, "insults, indignities, [and] threats" do not constitute outrageous conduct. *Cole, supra*, 43 Cal. 3d at 155 n.7.; *see also*, *Pitman v. City of Oakland*, 197 Cal. App. 3d 1037, 1047 (1988) ("Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.") (quoting Restatement (Second) of Torts § 46 cmt. j).

In *Yurick*, *supra*, 209 Cal. App. 3d at 1119, plaintiff's supervisor repeatedly told her in the presence of others that she was senile and a liar. The court held as a matter of law that this conduct was not sufficiently egregious to be actionable. *Id.* at 1129 (ordering that supervisor's summary judgment motion be granted). In *Trerice v. Blue Cross of California*, 209 Cal. App. 3d 878, 881-882 (1989), plaintiff alleged that her employer terminated her, repudiated a promise of severance pay, assigned her menial tasks, and subjected her to distressing jokes and gossip. The court affirmed the grant of summary judgment to the employer, finding that this behavior was not the kind of outrageous conduct necessary to support an intentional infliction of emotional distress action. *Id.* at 883-884. Similarly, in *Schneider v. TRW, Inc.*, 938 F.2d 986, 992 (9th Cir. 1991), plaintiff alleged that her supervisor screamed while criticizing her performance,

threatened to discharge her, and made menacing gestures. The court found that this conduct, while rude and insensitive, did not satisfy the outrageousness requirement. *Id.*

The conduct alleged by Plaintiff here does not meet the first element of a prima facie case of infliction of emotional distress because there is no "outrageous" conduct. The core of Plaintiff's complaint—that Chevron's conclusions about his misconduct was overblown, and that his employment was terminated as a result—is not "so severe that no reasonable man could be expected to endure it." *Pitman*, 197 Cal. App. 3d at 1047. Simply put, "[m]anaging personnel is not outrageous conduct beyond the bounds of human decency. . . ." *Janken v. GM Hughes Electronics*, 46 Cal. App. 4th 55, 80 (1996).

2. There is no evidence of "severe emotional distress."

Similarly, Plaintiff has not met the second element of a prima facie case of infliction of emotional distress because he has not suffered "severe emotional distress." In fact, he has suffered no discernible distress at all as a result of Chevron's conduct. Duste Dep. 288:23-289:22. In similar circumstances, the court in *Love v. Motion Industries, Inc.*, 309 F. Supp. 1128, 1137 (N.D. Cal. 2004) (citations omitted), dismissed the plaintiff's claim on summary judgment:

> "The Ninth Circuit has described severe emotional distress as 'emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it. Claiming to be tense, nervous, and emotionally hurt does not satisfy this standard."

Plaintiff Duste does not even claim that much. He can state no viable cause of action for either intentional or negligent infliction of emotional distress.

D. The sixth and seventh causes of action for slander and libel are barred because no false, malicious or unprivileged statements were made by any managing agent of Chevron.

A prima facie case for defamation, whether oral (slander) or written (libel), requires a showing that the defendant has made a false statement of fact, with malice, in an unprivileged context. *Monterey Plaza Hotel v. Hotel Employees Local 483*, 69 Cal. App. 4th 1057, 1064

(1999). Here, the undisputed evidence shows no basis for a claim of defamation against Chevron.

1. <u>The internal communications related to Taylor's investigation and Hinzie's termination decision</u>.

Plaintiff claims that Debra Taylor's made inaccurate references in her investigative report to his having visited strip clubs and a "brothel" with clients. *See, e.g.*, Duste Dep., Exh. 10, paragraph 1 ("Black listed Duste as being present at a strip club with clients in New Orleans submitted on his TEA, as well as being present at a 'brothel' in St. Maarten with client and partaking in lap dances."); paragraph 3 ("Black alleged during his interview with Global Security (GS) that Duste was present at a 'brothel' in St. Maarten wherein clients were being entertained."); paragraph 6 ("Duste also acknowledged that on the same trip to St. Maarten, with the same [Chevron] employees and clients at the client's request, a 'brothel' was visited, but no one purchased anything other than drinks.")

The references in Ms. Taylor's investigative report are true: Plaintiff does not dispute that he went to five strip clubs with clients, and that he accompanied clients to a questionable entertainment venue while on a trip to St. Maarten; he quarrels only with what he perceived as the implication that he had taken customers there, and argues that he did not know whether the venue in St. Maarten was a "brothel" or not (though he understood that that was how a subordinate, Tim Black, had characterized it):

> "We didn't take customers to a brothel. We didn't say, 'We're going to a brothel. Hey, let's all go.' We just end up there, decide that – I don't know if it's a brothel or not. All I know is that we go in the back of a normal strip-club-looking place, and we're in the back room there and we're going, this isn't for us, we're going back out front. Whether it was a brothel or not, I have no idea." Duste Dep. 179:3-11; *see also*, 181:9-15.

Taylor's references in her investigative report consistently put the term "brothel" in quotation marks, and include the detail that Plaintiff purchased only drinks at the locale. Taylor truthfully reported what she had been told by employee Tim Black and Plaintiff in her report.

Truth is an absolute defense to a claim of defamation. *Newberry v. Pacific Racing Ass'n*, 854 F.2d 1142, 1152 (1988).

More significant, even if Taylor's internal report had been factually inaccurate – and it was not – California Civil Code section 47(c) confers a privilege on communications made without malice between interested parties. An "interested party" is anyone who has an interest in the subject matter of the communication which goes beyond idle curiosity; the term is understood in its broadest possible sense. *Deaile v. General Telephone Co. of California*, 40 Cal. App. 3d 841 (1974); *Institute of Athletic Motivation v. University of Illinois*, 114 Cal. App. 3d 1, 11-12 (1980). The communications at issue here were clearly within the privilege. Taylor communicated the results of her investigation only to those few individuals with a legitimate need to know: Doug Hinzie, as the ultimate decision-maker with respect to the employees who were the subject matter of the investigation; Astley Blair, who had initiated the investigation; and Jennifer Edris, the Human Resources liaison who provided advice and counsel to the management team. Taylor's investigative report was also shared with Chevron's internal legal department for the same purpose. These individuals' interest in the investigative results was based on their obligations as company managers and advisors, and as such, all were "interested parties" as that term is used in Civil Code section 47(c).

Finally, Plaintiff cannot demonstrate any malicious intent on the part of anyone at Chevron, including Taylor. He testified, to the contrary, that he had no reason to believe that anyone at the Company took action with an intent to harm him. Duste Dep. 231:10-15. To demonstrate malice under California Civil Code section 47(c), Plaintiff must show the communication was "motivated by hatred or ill will towards the plaintiff or . . . the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights." *Dorn v. Mendelzon*, 196 Cal. App. 3d 933, 945 (1987). There is no evidence that Taylor, or any other Chevron employee, was motivated by hatred, or was reckless, in their treatment of Plaintiff. Taylor's careful and thorough investigation, and the thoughtful consideration given to the matter by Hinzie before making his termination decision, all belie any such conclusion.

2. <u>The communications by Keith Sawyer to Chevron dealers and distributors with whom Plaintiff had been a key Chevron contact</u>.

The same analysis outlined above applies to any alleged statements made by Chevron manager Keith Sawyer to the Company's distributors and dealers. There is no evidence of any communication to such third parties other than to let them know that Plaintiff was no longer with Chevron, and therefore would no longer be their contact at the Company. These communications were truthful, and made to "interested" parties on a strictly need-to-know basis. In addition, there is no evidence to suggest that the communications were made with malice. To the extent that Plaintiff's defamation claims are based on these sorts of communications, therefore, they also fail as a matter of law.

3. <u>The alleged statements made by Tim Black to Ed Zwirn</u>.

At the eleventh hour, and in connection with this motion, Plaintiff has advised that he has obtained declarations from former Chevron employee Tim Black, and former Chevron customer Ed Zwirn. Though as of this filing Defendant's counsel has not seen Black's declaration, the Zwirn declaration states that he was told sometime in 2007 by Tim Black[11] that Plaintiff had been terminated by Chevron because he "took clients to Gentlemen's Clubs and Brothels." These declarations, even if true, fall far short of the evidence needed by Plaintiff to support a claim of defamation by Chevron.

For Chevron to be liable for a claim of slander – an intentional tort – Plaintiff must meet the elements of California Civil Code section 46, which requires in relevant part that he demonstrate that *Chevron* made a "false and unprivileged publication, orally uttered," which "tends directly to injure [plaintiff] in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits;" or "which, by natural consequence, causes actual damage." Cal. Civil Code § 46, subsections 3, 5.

---

[11] The Zwirn declaration also makes reference to other unnamed Chevron employees, with no detail about their identities.

Here, the only person who allegedly slandered Plaintiff is Tim Black, a former Chevron employee who had reported to Plaintiff prior to 2007. Plaintiff bears the burden of proving that *respondeat superior* liability applies. Matthew Bender, *California Forms of Pleading and Practice*, vol. 21, section 248.16[1]; *Munyon v. Ole's, Inc.*, 136 Cal. App. 3d 697, 701 (1982); *Ducey v. Argo Sales Co.*, 25 Cal. 3d 707, 721 (1979). That is, Plaintiff must demonstrate that the employee's alleged conduct – here, Tim Black's alleged defamatory comment to Ed Zwirn – was committed within the scope of Black's employment. *Yamaguchi v. Harnsmut*, 106 Cal. App. 4th 472, 481 (2003).

Plaintiff does not, and cannot, dispute that whatever Black may have said to Zwirn, it was not "within the scope" of Black's employment. As discussed in the Hinzie declaration, paragraph 14, Black's job duties did not call upon him to communicate discipline or termination decisions, and the reasons therefore, to third parties. Black – who had not reported to Plaintiff for over a year at the time of the alleged statement – was not authorized or expected to convey information about Plaintiff to anyone, and his job duties did not require him to do so. In fact, Chevron policy (Exhibit C to the Hinzie declaration) expressly prohibits employees from disclosing such information, and Black was explicitly instructed by investigator Taylor that he was not to discuss her investigation, or any information provided by or to him, with anyone else. Taylor Decl., ¶ 14. Consequently, if Black took it upon himself to communicate his speculation about the basis for Plaintiff's termination to Zwirn – speculation that did not, in fact, accurately describe Chevron's basis for terminating Plaintiff's employment – there is no basis in law for imputing Black's conduct onto Chevron. Chevron could not reasonably do anything more than it did in this case to ensure that Plaintiff's privacy and reputation were undamaged; it should not now be held responsible for the unsanctioned conduct of a rogue ex-employee.

4. <u>As an independent basis for dismissal, Plaintiff has shown no damage flowing from Black's alleged slander.</u>

In addition, the required element of damage flowing from Black's alleged is entirely absent here. Plaintiff can show no impact on his "office, profession, trade or business," nor can he show any "actual damage," as required by Civil Code section 46. To the contrary, Plaintiff

had admitted that he got a new job in the same industry in record time, and that none of the individuals with whom he has interacted since – including Ed Zwirn – seemed to have treated him any differently, no matter what they had heard. Whatever unauthorized comments may have been said about Plaintiff by Black or others, these comments do not constitute "slander" under the law when no damage has resulted.

## V. PLAINTIFF'S BREACH OF CONTRACT CLAIM (EIGHTH CAUSE OF ACTION) SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS IDENTIFIED NO CONTRACT BETWEEN HIMSELF AND CHEVRON.

Plaintiff's complaint alleges that Chevron breached a contract between itself and Plaintiff; but Plaintiff utterly disavowed such a claim during his deposition. As described in section II.G. above, Plaintiff understood that his employment with Chevron was terminable "at will." He further testified that the Company had violated no policies or procedures in connection with the termination of his employment. Based on these undisputed facts, Plaintiff cannot assert a claim for breach of contract in this case.

## VI. PLAINTIFF'S CLAIM FOR VIOLATION OF THE UCL (NINTH CAUSE OF ACTION) FAILS AS A MATTER OF LAW.

As his ninth cause of action, Plaintiff alleges that Chevron has violated the Unfair Competition Laws ("UCL") (Cal. Bus. & Prof. Code §§ 17200 *et seq*.) by engaging in the above-described allegedly unlawful activity. Under the UCL, a private plaintiff's remedies are limited to injunctive relief and restitution. *Kasky v. Nike*, 27 Cal.4th 939, 950 (2002); *see also Johnson v. Hertz Local Edition Corp.*, No. C 03-4439 MJJ, 2004 WL 2496164, at *5 (N.D. Cal. Nov. 3, 2004) ("Only equitable relief is available in a civil suit under [the UCL]") (citing *Herr v. Nestle U.S.A., Inc.*, 109 Cal. App. 4th 779, 789 (2003)); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1144 (2003) ("A UCL action is equitable in nature; damages cannot be recovered."). In this case Plaintiff seeks neither injunctive relief nor restitution, rendering his UCL claim inapposite and subject to dismissal.

Plaintiff's UCL claim fails for the additional reason that he may not bootstrap a cause of action for violation of the UCL to his claims of negligence, breach of contract, and the like. The

purpose of the UCL is to protect consumers and competitors by promoting fair competition in commercial markets for goods and services. *Kasky*, 27 Cal.4th at 949 (2002). The Legislature never intended that the UCL be used as "an all-purpose substitute for a tort or contract action." *Korea Supply Co.* , 29 Cal. 4th at 1150. Summary judgment is appropriate, where, as here, a plaintiff's UCL claim is predicated on his other claims. *See Johnson*, 2004 WL 2496164, at *5 (granting summary judgment where UCL claim arose out of other employment claims that were summarily adjudicated in defendant's favor). Plaintiff is not attempting to enjoin an unlawful or unfair business practice and is not acting on behalf of competitors or consumers. He seeks redress for a private wrong. The UCL provides no basis for his claims.

Finally, Plaintiff cannot establish that Chevron engaged in unlawful, unfair or fraudulent practices in violation of the UCL. In *Zoeller v. Sterling Capital Mortgage*, No. C-99-1045 PJH, 2000 WL 1175587, at *10 (N.D. Cal. Aug. 14, 2000), plaintiff contended that defendant terminated him and made defamatory statements to prevent him from obtaining employment elsewhere. He argued that this alleged conduct supported a claim under the UCL. *Id.* The Court disagreed, holding that "plaintiff has provided no evidence that defendants engaged in any unlawful, unfair, or fraudulent business practice." *Id.* Although Plaintiff has similarly alleged that Chevron has terminated him and made defamatory statements, he has provided no evidence that Chevron engaged in any unlawful, unfair or fraudulent business practice. For these independent reasons, Chevron is entitled to summary judgment on Plaintiff's ninth cause of action as well.

VII. CONCLUSION.

For the foregoing reasons, Chevron respectfully requests that its motion for summary judgment be granted in its entirety, and that Plaintiff's case be dismissed. In the alternative, Chevron requests that the Court grant partial summary judgment as to the claims for which there are no disputed issues of material fact.

Dated: October 1, 2009.

PILLSBURY WINTHROP SHAW PITTMAN LLP
MARCIA L. POPE
ALEX PONCE DE LEON
50 Fremont Street
Post Office Box 7880
San Francisco, CA 94120-7880

By /s/ Marcia L. Pope
Marcia L. Pope

Attorneys for Defendant
CHEVRON U.S.A. INC.